UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

John Wigmore, as Trustee of the
  Wigmore Survivor Trust and the
  Wigmore Residuary Trust,

              Plaintiff

v.

Liberty Trading Group and
  James Cordier and Michael Gross,

              Defendants.

File No. _____
DEMAND FOR JURY TRIAL

## COMPLAINT

Plaintiff John Wigmore, as Trustee of the Wigmore Survivors Trust and the Wigmore Residuary Trust ("Wigmore") for their complaint allege as follows:

## I. INTRODUCTION

1.      John Wigmore was promised by James Cordier ("Cordier"), President of Liberty Trading Group ("Liberty"), that the monies he deposited in JP Morgan Chase Bank would remain in a segregated individual account set aside for selling options under the direction of James Cordier, a registered commodities trading advisor. This promise specifically assured John Wigmore that if either Peregrine Financial Group ("PFG"), a registered commission futures merchant who cleared the transactions directed by Cordier, or Liberty ever become insolvent, his funds would be safe and available to him in the full amount listed on his account statement. Cordier further represented that the only risk of loss that Wigmore faced was that from the market. In July, 2012, PFG filed for bankruptcy and over the next several months Wigmore learned that these representations

1

were false and that he could not withdraw his monies and would lose more than $1.4 million dollars of the monies listed in his last account statement issued by PFG. Liberty has failed to make good on its promise that Wigmore's monies would be safe in the event of a PFG insolvency. This action is brought for violation of the Commodities Exchange Act, fraud, breach of fiduciary duty, violation of the Florida Antifraud Statutes and breach of contract. Plaintiff seeks to recover monies in the amount as stated in his July 20, 2012 accounts when PFG filed for bankruptcy, plus interest and punitive damages.

## II.  JURISDICTION AND VENUE

2.      Venue is appropriate in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b) because this is the district where defendants Liberty Trading Group, James Cordier and Michael Gross transact business and where the acts complained of occurred. This Court has jurisdiction pursuant to the Commodities Exchange Act ("the CEA"), 7 U.S.C. § 13a-2(4) because Wigmore alleges a violation of the CEA and under 28 U.S.C. § 1332 because this civil action is a matter in controversy which exceeds $75,000 and is between citizens of different states.

## III.  THE PARTIES AND OTHER RELEVANT PLAYERS

3.      Plaintiff John G. Wigmore is a widower, age 85, and a California resident in the City of Encinitas. He is the sole trustee of the two trusts, the Wigmore Survivors Trust and the Wigmore Residuary Balance Trust created by the Will of Dina B. Wigmore upon her death in April 1994. Wigmore is the income beneficiary. The remainder beneficiaries of the two trusts are Wigmore's natural children, his son John G. Wigmore, Jr. and his daughter, Mary Wigmore Reynolds and his two step children Alexander Trueblood and Adam Trueblood by his deceased wife's prior marriage.

2

4.      Defendant Liberty is a Florida entity whose address is 401 East Jackson Street, Suite 2340, Tampa, Florida, specializing in managing the selling of commodity options at the direction of its principal James Scott Cordier.  Liberty is a registered Introducing Broker and Commodities Trading Agent.  Cordier is an employee and affiliate of Liberty.

5.      Defendant Cordier is an experienced commodities trader who specializes in selling out-of-the money commodities options. His business address is 401 East Jackson Street, Tampa, Florida 33602.  During the events alleged in the Complaint, he was a recognized commodities expert.  In addition to co-authoring with Michael Gross the authoritative book: "The Complete Guide to Option Selling" (McGraw Hill 2005, followed by a second edition).  Cordier's commodity investment articles and market comments have been published in the Wall Street Journal, Barrons Weekly and Yahoo Finance.  He has appeared on Bloomberg TV and CNBC.

6.      Defendant Michael Gross has offices at 401 East Jackson Street, Suite 2340.  He is an employee of Liberty, working under and at the direction of Cordier.

7.      Russell Wasendorf (a non-party), the former president of PFG, pleaded guilty to stealing $215,000,000 of PFG's customers' funds. The Commodities Futures Trading Corporation ("CFTC") instituted a civil action against PFG.  PFG immediately filed for Chapter 7 liquidation in the United States Bankruptcy Court for the Northern District of Illinois.  In re Peregrine Financial Group, Inc. Case No. 12-27488.  Over 24,000 former customers lost most of their money invested with PFG.  Wasendorf was indicted in the Northern District of Iowa, pled guilty and in early 2013, was sentenced to 50 years in prison and ordered to pay more than $215,000,000 in restitution.  He is in

3

prison and judgment proof. PFG remains in bankruptcy under Chapter 7 liquidation in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 12-27488.

8. Peregrine Financial Group (PFG) (a non-party) was a registered Futures Commission Merchant (FCM) with offices in Chicago, Illinois and Cedar Falls, Iowa. Since at least 2005, Cordier had used PFG to execute commodity-related trades originated and directed by Cordier. The relationship between Cordier/Liberty Trading and PFG is embodied in a "Clearing Agreement" entered into in October 2005. Cordier directed his clients to deposit their funds into bank accounts which PFG selected and to which it had access.

9. National Futures Association (NFA) (a non-party) is a self-regulatory organization for the U.S. derivatives industry. NFA has developed and enforced rules, provided programs and offered services that safeguard market integrity, protect investors and help its members meet their regulatory responsibilities for more than 30 years. On four occasions, NFA has proceeded against PFG for regulatory violations and in each case NFA imposed monetary penalties. In a 1996 proceeding, the NFA charged among other violations that PFG failed to segregate its customer accounts. In 1996, NFA fined PFG $75,000, in 2000 NFA fined PFG $90,000, in 2004, NFA fined PFG $5,000 and, in February 2012, NFA imposed a $700,000 penalty. NFA's disciplinary proceedings together with the imposed fines were known to Cordier and Gross.

IV. FACTS

10.     In 2008, Wigmore was seeking an alternative investment for the funds owned by the two trusts,  At that time, the trusts were under the management of Edward Jones Company who had placed the trusts' funds into an American Capital Group fund. In the Summer of 2008, Wigmore was seeking an alternative investment to enhance the trusts' capital.  Wigmore had an amateur's knowledge of the stock market and equity options but did not believe he was competent to manage the trusts' funds.  Wigmore read Cordier's and Gross's book published in 2004 entitled "The Complete Guide to Option Selling."  The book explained the principles of selling out-of-the-money options on commodities.  Their book reflected their knowledge of the commodities markets and extolled their experience, professionalism and high standards.  They wrote they were available as experienced professionals to manage option selling accounts for others.

11.     In addition, Cordier and Gross published various marketing brochures holding out their expertise as commodity experts and suggesting the reader avail himself of their services.  By August 2008, Wigmore decided to meet them personally.  The purpose of the meeting was to ascertain the safety of the trusts' funds if they were to be placed under their management.

12.     At the August 7, 2008 meeting in Cordier's office in Tampa, Wigmore expressed his concern how the trust monies would be held under Cordier's management. Because the trusts represented the source of most of Wigmore's retirement income, Wigmore impressed upon Cordier and Gross the importance of the safety of the trusts' funds. Cordier and Gross represented to Wigmore that "the only risk to your funds is market risk."  They assured Wigmore that the trusts funds would be in a safe, individual

5

account at JP Morgan Chase Bank in New York City and not comingled with other accounts and would be 100% available to Wigmore in the event of PFG's or Liberty's insolvency.  The colloquy between Wigmore and Cordier in Cordier's office on August 7, 2008 was substantially as follows:

13.     Wigmore asked "Where do I deposit my funds?"  Cordier's answer: "Deposit your funds at the JPMorgan Chase Bank in New York per my instructions."

Q.     "How will my money be maintained?"  Cordier's answer: "Your money will be held in a separate and individual account in your name at the JPMorgan Chase Bank in New York City."

Q.     "Will my funds be commingled with other funds at the JPMorgan Chase Bank?"  Cordier's answer: "No.  Your money will be held in a separate and individual account in your name at the JPMorgan Chase Bank."

Q.     "What will happen to my funds if Cordier and/or Liberty or PFG becomes insolvent?"  Cordier's answer. "The only risk to your money is market risk. Your funds are in a separate, individual account at JPMorgan Chase Bank outside of PFG, and will not be commingled with any other accounts and will be safe and 100% available to you in event of any such insolvency.  Your funds will sit safely in a JPMorgan Chase Bank account beyond the reach of PFG or Cordier's creditors in the event of insolvency."

14.     Cordier wrote and distributed to his potential clients and current investors Cordier's responses in a stand alone document employed as a marketing tool entitled "Frequently Asked Questions."  Cordier routinely furnished the FAQ to Cordier's investors and potential clients to encapsulate Cordier's responses to each question in a single document.  The client questions respecting the safety of client funds and Cordier's

answers thereto are set forth in writing at page 5 of Cordier's Frequently Asked Questions are virtually identical to the oral representations and promises made by Cordier to Wigmore:

Q.     "How safe are my funds with you?"

"A.     The only risk to your funds is market risk. Your funds are on deposit through a third party clearing firm (PFG) and sit in a Customer Segregated Account at JP Morgan Chase Bank. The customer segregated account system means your funds remain in an individual account under your name outside of PFG.  Your funds are not commingled with PFG funds, Liberty Trading funds or other account funds. In the unlikely event that PFG or Liberty Trading Group would ever become insolvent, your funds remain safe and would be 100% available to you."

15.     Wigmore relied on Cordier's representations and guarantee regarding the safety of Wigmore's trust funds.  In August and September 2008, Wigmore requested Edward Jones Company to wire the cash in the two trusts to JPMorgan Chase Bank pursuant to Cordier's instructions.  Edward Jones Company, pursuant to Cordier's instructions wired funds to JPMorgan Chase Bank.

16.     During the period from latter 2008 to mid-2012, Cordier managed the Wigmore trust funds.  The market value of the two trust accounts appreciated significantly in the years 2009 and 2010.  However, these trust accounts suffered market losses in the year 2011 and the first half of 2012.

17.     In July 2012, the CFTC disclosed that Russell Wasendorf, the president of PFG, had stolen approximately $215,000,000 from PFG's customer accounts for his

7

personal use.  All trading through PFG was halted and PFG's remaining assets placed in receivership under the control of a trustee appointed by the bankruptcy court in Chicago.

18.     Cordier's and Gross' representations of the safety of the trust funds were tantamount to a guarantee the trust monies would be safe and (except for market risk) the trust funds would always be 100% available even should PFG or Liberty/Cordier become insolvent.  This was crucial. The trust monies were the source of Wigmore's retirement income.

19.     Cordier's representations regarding the safety of Wigmore's money including the safety of his trust funds were patently and knowingly false when made. When PFG announced its insolvency in July 2012, it was revealed the trust funds were not "sitting" in an individual account in the trusts' names at JPMorgan Chase Bank "outside of PFG."  Wigmore's trust funds were and had been maintained in account(s) commingled with some 14,000 other PFG customer accounts and that PFG has used these customer accounts as its personal checking account.  Nor were the trust funds "100% available" to Wigmore on PFG's insolvency.  Wigmore like every other Cordier client with funds at PFG lost most of his trusts' money.

20.     Cordier and Liberty had close ties to PFG as an introducing broker to its clearing firm.  PFG executed all of the trades directed by Cordier as commodities trading agent.  Under their clearing agreement, in addition to the usual obligations and services performed by the clearing firm and introducing broker, PFG agreed to guarantee the performance of Liberty regarding maintenance of the adjusted net capital requirements of CFTC Regulation §1.17, 17 C.F.R. §1.17.  This meant that PFG and not Liberty would be

QB\22086427.8

required to meet the ongoing obligation of calculating and satisfying the adjusted net capital requirement.

21.     The Clearing Agreement also provided that Liberty was to require each of its customers to become clients of PFG.  Customers introduced to PFG by Liberty were required to sign contracts, provide detailed financial information and to send their account funds or securities directly to banks selected by PFG.  In fact, Liberty customers executed no agreements with Liberty and in practice became customers of PFG and its selected banks in order to receive the trading advice offered by Liberty.  Liberty and Cordier placed the safety of their clients' investment funds solely in the hands of PFG and its selected banks even though the clients had selected Liberty and Cordier as their commodities trading advisors and the clients had no previous information, knowledge or relationship with PFG or its selected banks.

22.     Even though Liberty and Cordier had required its customers to transfer their funds to PFG, they failed to disclose to these customers the history of PFG's regulatory violations.  In addition, Liberty and Cordier did not disclose that PFG had been sanctioned by the National Futures Association ("NFA") for violations of federal statutes and regulations, including violations related to PFG's failure to properly segregate customer funds.  Beginning in December, 1996, a NFA committee filed a complaint alleging among several violations that PFG failed to perform segregated funds computations, to maintain adequate segregated funds and to report to the NFA that the firm was under segregated.  Among other sanctions, PFG agreed to accept the allegations of the NFA complaint and pay a $75,000 fine.  Under both the Commodities Exchange Act ("CEA") and its accompanying regulations, PFG was required to maintain customer

funds in segregated customer accounts and maintain records that demonstrate that these funds were in fact segregated.

23.     In 2000, PFG was charged by the CFTC in an administrative proceeding alleging that PFG failed to notify the CFTC that its adjusted net capital was below the minimum required and that PFG failed to keep accurate books and records.  PFG paid a fine of $90,000 to settle these allegations.

24.     In 2004, the NFA again issued a disciplinary complaint against PFG alleging that it failed to audit one of its introducing brokers it guaranteed.  PFG paid a fine of $5,000 to resolve these allegations.

25.     More recently, in February, 2012, the NFA issued yet another disciplinary complaint against PFG, its president and chief compliance officer alleging that they failed to supervise four of their guaranteed introducing brokers who engaged in deceptive sales practices.  To settle these allegations, PFG paid a fine of $700,000 and PFG accepted a two-year ban from entering into any new guaranteed introducing broker agreements.  The financial stability of PFG's "guaranteed" introducing brokers will have a direct impact on PFG's continuing solvency.

26.     As a member of the NFA, defendants had access and knowledge of PFG's disciplinary allegations, settlements, sanctions and fines, the largest of which, the $700,000 fine in February, 2012, occurred six months before PFG was forced into bankruptcy.

27.     Not only did Liberty and Cordier fail to disclose PFG's violations of federal statutes and regulations, they took no steps to either monitor PFG's compliance with the segregated customer account requirements or to terminate its clearing agreement

with PFG.  Liberty and Cordier did not advise their customers that maintaining their accounts with PFG placed their funds at risk of loss.  In fact, neither Liberty nor Cordier ever withdrew their oral and written representations that customer funds faced no risk if either Liberty or PFG became insolvent.

28.     Had defendants disclosed PFG's disciplinary record at the outset, Wigmore would not have transferred his funds to defendants' management.

29.     Had Liberty or Cordier alerted their customers to PFG's most recent disciplinary complaint in February, 2012, Wigmore would have withdrawn his funds.

30.     PFG's last statements, dated July 20, 2012, listed the amount in the two trust funds, respectively as:

| | |
|---|---|
| Wigmore Survivors Trust | $1,116, 679.75 |
| Wigmore Residuary Balance Trust | $1,030, 631.82 |
| | $2,147,311.57 |

These statements reflect the true amounts of Wigmore's trust funds in each of Wigmore's trust accounts on July 20, 2012 but for the Wasendorf theft.  To date, the PFG bankruptcy trustee has distributed to both trust accounts a total of $670,267 from the bankrupt's estate leaving a remaining total lost principal balance of $1,477,043 for both accounts.  The trustee expects any other distributions to be far smaller and that PFG customers are faced with substantial losses.  The trusts' losses would have been avoided had defendants placed their clients' funds in safe, individual, non-comingled accounts at JP Morgan Chase Bank as they represented and guaranteed.

31.     Cordier marketed himself and his management services on the representation that neither he nor Liberty had been the subject of any regulatory actions, nor NFA arbitration awards nor CFTC reparation cases.  At the same time, however, Cordier's failed to inform Wigmore and Cordier's clients and withheld the facts that his

11

clearing firm, PFG, integral to Cordier's management of his option selling services, had a disciplinary record before the NFA.

32.     Cordier knew that in 1996, 2000 and 2004 the NFA had invoked disciplinary proceedings against PFG for regulatory violations and had imposed fines. PFG's violations were obvious red flags raising serious questions regarding PFG's instability, lack of integrity and non-compliance with the regulatory rules.  Nonetheless, in 2005 Cordier signed the "Clearing Agreement" with PFG.  Those NFA violations and fines were a clear warning of PFG's character and signaled problems ahead.  More recently, in February 2012, NFA charged PFG with a violation of regulations and imposed a $700,000 fine.  Cordier never revealed any of PFG's violations.

33.     Cordier's and Gross' book "A Complete Guide to Option Selling" First Edition, McGraw Hill 2005, in the chapter entitled "Finding a Good Broker or Money Manager" the authors advise, respecting NFA history, at p. 212, "---if the report on the broker or the firm pulls up a long list of complaints, it's best to steer clear."  And at p. 214, the authors ask rhetorically " Does she have any complaints on file with the NFA?" In this case, the public record reveals that PFG had a history of admitted regulatory violations where the NFA had imposed significant monetary penalties. Notwithstanding, Cordier didn't "steer clear."  He could make a choice of PFG for his own account but his fiduciary obligations to Wigmore and his other clients compelled him to exercise the utmost care to protect and preserve Wigmore's funds. Cordier's fiduciary obligations mandated Cordier "to steer clear" of PFG, a serial violator.  The NFA disciplinary record was a red flag signaling trouble ahead.  Instead, he chose to place his clients' funds at PFG notwithstanding his fiduciary obligations to exercise the utmost care to protect and

12

preserve their property. He chose PFG notwithstanding his own contrary advice given to readers of his book. He violated not only his professional and fiduciary obligations to his clients "to steer clear" of PFG but his own standard of conduct enunciated in his book.

34.    Had Wigmore been so advised of PFG's violations considering the nature of Cordier's discretionary accounts and his fiduciary obligation, Wigmore would have chosen not to invest with Cordier. Could Cordier purposely have not revealed PFG's disciplinary history to his clients and Wigmore in particular because they would have rejected Cordier's services or withdrawn their funds from Cordier? Because of Cordier's deceitful omission to reveal PFG's disciplinary history, Wigmore relied on Cordier and lost in excess of $1.4 million of the trusts' funds.

35.    From the fall of 2008 through July 2012, notwithstanding PFG's previous disciplinary record, Cordier employed PFG and maintained the Wigmore trusts' funds at PFG in violation of Cordier's fiduciary duty of exercising the utmost care to protect and preserve Wigmore's trust funds although Cordier had represented to Wigmore the 100% safety of the Wigmore trust funds.

36.    Had Cordier informed Wigmore and his clients of PFG's regulatory violations Cordier would have provided his prospective clients with the opportunity to properly assess the risk of loss of their funds and should they choose withdraw their funds (or invest elsewhere) before it was too late. A violation of Cordier's fiduciary duty to his clients.

37.    On March 30, 2012, Cordier charged the two Wigmore trust accounts an aggregate commission in the sum of $64,032 on what was essentially a single trade. The amount of the commission was debited to Wigmore's two accounts and credited to

Cordier's account.  Wigmore brought this to Cordier's attention.  Cordier offered to credit Wigmore's accounts by 66% of the amount of the $64,032 and provide his managerial services for the remainder of the year 2012 virtually without charge. To avoid rancor, Wigmore accepted.  The Wasendorf theft terminated trading in July 2012.

38.     At p. 215 of Cordier's and Gross' book (1st Ed) in the chapter entitled "Finding a Good Broker or Money Manager," the authors at the head of a sub-chapter state the broker should be "Focused on You, Not on Himself."  The allegations herein refer to numerous instances where the authors ignored their primary responsibility to plaintiff and their other clients as well.  Had they acted for their clients first, client funds including Wigmore's trust funds would never have been placed with PFG.  PFG's NFA and CFTC violations warned that PFG was not a proper party to handle Cordier's client funds to be treated with the utmost care to ensure their protection and preservation. Defendants ignored their primary responsibility to plaintiff and their other clients. Had defendants performed their fiduciary obligations, defendants would not have maintained client funds at PFG.

39.     Obvious "red flags" reflected PFG's true character and warned the investor away.  Cordier did nothing to inform his clients nor "steer clear" to protect and preserve his clients' monies from loss.

COUNT I - VIOLATION OF SECTIONS 6b and 60 OF<br>THE COMMODITY EXCHANGE ACT

40.     Paragraphs 1 through 39 are re-alleged and incorporated herein.

41.     The Commodity Exchange Act 7 U.S.C. Sections 6b(1)(2)(A)(B)(C) and 6o1(1)(A) and (B) make it unlawful for a commodity trading advisor to employ any artifice to defraud any prospective client or participant or to engage in any transaction,

14

practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client.

42.     Cordier's scheme consisted of falsely and intentionally soliciting plaintiff and others to turn their funds over to Cordier to manage by:

Representing to plaintiff and prospective and actual clients that their funds would be safe in individual accounts in plaintiff's name at JP Morgan Chase Bank, and in the event of PFG's or Liberty's insolvency plaintiff's funds would be 100% available because such funds would be held in a segregated account in a bank account in the name of each investor. In addition, defendants failed to disclose PFG's NFA and CFTC disciplinary record and intentionally and deliberately maintained plaintiff's funds in a known unsafe environment resulting in the loss of plaintiff's funds. Cordier knew or reasonably should have known that such material representations and omissions were false and reckless and that Wigmore would rely on these false and reckless statements and omissions. As a result of these false and reckless statements and omissions, Wigmore has lost in excess of $1.4 million dollars.

COUNT II - MISREPRESENTATIONS

43.     Paragraphs 1 through 39 are realleged and incorporated herein.

44.     Cordier falsely and intentionally represented to plaintiff as a prospective client that his trust funds would be safely held in an individual account at JP Morgan Chase Bank in the name of plaintiff and in the event of PFG's insolvency, Wigmore's trust funds would be 100% available. Such representations imposed trustee's obligations to exercise utmost care to protect and preserve Wigmore's funds. Cordier knew or

15

should have known that such representations were false and reckless and that Wigmore would rely on these false and reckless statements.

45.     Cordier also failed to disclose PFG's disciplinary history, and such a material omission had the affect of making the representations about the safety of Wigmore's funds held in an individual account in his name false and deceptive.

46.     Cordier directed Wigmore to deposit his trusts funds with JPMorgan Chase Bank when Cordier knew or reasonably should have known that the funds would not be placed in an individual account in Wigmore's name and would not be 100% available in the event of PFG's insolvency.  Defendants knowingly maintained plaintiff's funds in an unsafe environment resulting in the loss of plaintiff's funds.  Cordier knew that Wigmore was relying on the representations about the safety of his account funds, and Wigmore did rely on these false and reckless representations.  Wigmore has suffered in excess of $1.4 million in losses as a result of these fraudulent representations and omissions.

## COUNT III - FLORIDA SECURITIES AND INVESTOR PROTECTION ACT ("FSIPA")

47.     Paragraphs 1 through 46 are realleged and incorporated herein.

48.     Cordier, Gross and Liberty are subject to the requirements and prohibitions of the FSIPA.

49.     Cordier, Gross and Liberty violated Section 517.301(1)(a) by making false material statements to Wigmore (and other investors) that their funds deposited through PFG were safe in individual accounts in his name held at JP Morgan Chase Bank free of all risk should PFG or Liberty become insolvent and by failing to disclose that PFG had a

disciplinary history of violating CEA statutes, rules and regulations as well as suffering NFA sanctions.

50.     As a result of these violations of the FSIPA, Wigmore has suffered damages in excess of $1.4 million.

COUNT IV - FLORIDA DECEPTIVE AND UNFAIR TRADE
TRADE PRACTICES ACT ("FDUTPA")

51.     Paragraphs 1 through 46 are realleged and incorporated herein.

52.     Cordier, Gross and Liberty are subject to the requirements and prohibitions of the FDUTPA.

53.     Cordier, Gross and Liberty violated Section 501.24 of the FDUTPA by committing unfair and deceptive acts in the course of soliciting Wigmore to invest his funds with them through PFG.

54.     These unfair and deceptive acts included, but are not limited to, material misrepresentations made to Wigmore (and others) by Cordier, Gross and Liberty that Wigmore's funds deposited into JP Morgan Chase Bank through PFG would be safe and available in individual accounts under Wigmore's name even if Liberty or PFG were to become insolvent.

55.     In addition, Cordier, Gross and Liberty failed to disclose to Wigmore that PFG had been the subject of several disciplinary actions commenced by the CFTC and NFA alleging numerous violations of the CEA and other rules and regulations including those which required PFG to segregate customer monies in separate individual accounts apart from operating accounts of PFG.

56.     These violations of Section 501.24 damaged Wigmore by causing his monies to be comingled with other investors' monies and to be lost to Wigmore in the bankruptcy of PFG.  Wigmore suffered damages in excess of $1.4 million

## COUNT V - BREACH OF GUARANTEE

57.     Paragraphs 1 through 46 are realleged and incorporated herein.

58.     Cordier's representations respecting the safety of plaintiff's trust funds were tantamount to a guarantee of the safety of plaintiff's trust funds and that such funds would be safely held in an individual account at JP Morgan Chase Bank and 100% available in the event of the insolvency of PFG.

59.     Cordier, through PFG, directed plaintiff to deposit his trusts funds with JPMorgan Chase Bank when plaintiff knew that the funds would not be placed in a safe individual account and would not be 100% available in the event of PFG's insolvency.

## COUNT VI - BREACH OF FIDUCIARY DUTIES

60.     Paragraphs 1 through 46 are realleged and incorporated herein.

61.     Liberty is a registered commodities trading advisor and Cordier and Gross are associated persons.  Liberty and Cordier had complete discretion in Wigmore's account to buy and sell futures options based on their experience, skill and judgment. Liberty and Cordier knew that Wigmore was not an experienced commodities future trader and Liberty and Cordier assumed a special relationship of trust and confidence with Wigmore.  As a result of this special relationship in which Wigmore placed his confidence in Liberty and Cordier, they accepted his trust in the management of his funds.

62.     As a result of this relationship, Liberty and Cordier owed a fiduciary duty to act in the best interests of Wigmore, to act with all due care in advising Wigmore and trading on his behalf and to be honest in their dealings with and on behalf of Wigmore.

63.     Liberty and Cordier breached their fiduciary duties to Wigmore by falsely and recklessly representing to Wigmore both orally and in writing that his invested funds would be safe in the event either or both PFG or Liberty became insolvent.  They falsely and recklessly represented that these funds would be safe from these insolvencies because they would be held in individual accounts in plaintiff's name and not be comingled with other accounts nor subject to the claims of creditors or to the claims of other investors. Liberty and Cordier knew that these representations were false or made them with reckless indifference as to their falsity.

64.     Cordier and Liberty also breached their fiduciary duties by failing to disclose to Wigmore on August 7, 2008 or before Wigmore deposited his funds at JP Morgan Chase Bank that PFG had been sanctioned by the NFA and CFTC, and failed to disclose the February, 2012 violation and fine just months before PFG was forced into bankruptcy.  Had Cordier and Liberty fulfilled their fiduciary duties and disclosed the disciplinary sanctions imposed on PFG, Wigmore would not have placed his funds under Cordier's management.

65.     Cordier and Liberty misrepresented their option management services' disciplinary history by failing to disclose PFG as an integral part of their services had violated NFA and CFTC rules on multiple occasions.

66.     Cordier breached his fiduciary duty to Wigmore by failing to protect and preserve Wigmore's funds by placing plaintiff's trust funds with PFG with knowledge of PFG's disciplinary history placing those funds in peril of theft or loss.

67.     Without informing Wigmore, Cordier placed Wigmore's trust funds with PFG contrary to Cordier's representations of 100% safety of the funds when Cordier knew PFG's disciplinary record  threatened the safety of those funds in breach of his fiduciary obligation to protect and preserve plaintiff's trust funds.

68.     Cordier directed Wigmore to deposit his trusts funds with JPMorgan Chase Bank when Cordier knew that the funds would not be placed in a safe, individual account and would not be 100% available in the event of PFG's insolvency.

69.     Cordier knowingly maintained Wigmore's funds in an unsafe environment resulting in the loss of Wigmore's funds.

70.     Cordier overreached on trade commissions to his advantage at the expense of Wigmore.

71.     Cordier breached his fiduciary duty to Wigmore by failing to protect and preserve Wigmore's trust funds by placing these trust funds with PFG with knowledge of PFG's disciplinary history placing those funds in peril of theft or loss.

72.     As a result of defendants' breaches of their fiduciary duties, Wigmore suffered losses in excess of $1.4 million.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Wigmore demands as follows:

1.     Judgment in favor of the Wigmore Trusts against defendants, jointly and severally, in the amount of $1,477,311.57 together with pre-judgment interest; post

QB\22086427.8

judgment interest; attorneys' fees pursuant to Sections 501.2105 and 517.211, Florida

Statutes, and punitive damages; and

    2.      Plaintiff demands a trial by jury for all issues so triable.

    3.      Such other and further relief as the Court may deem necessary and

appropriate.

Dated:  October 4th, 2013               Respectfully submitted,

                                   Quarles & Brady LLP

                                   By_____

                                   Paul E. Parrish
                                   Quarles & Brady LLP
                                   101 East Kennedy Boulevard
                                   Suite 3400
                                   Tampa, FL  33602

                                   Michael H. Schaalman
                                   Quarles & Brady LLP
                                   411 East Wisconsin Avenue
                                   Milwaukee, WI  53202

                                   Attorneys for Plaintiff